UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JENNIFER BRENNAN,

                         Plaintiff,                      **DECISION AND ORDER**

        -against-                         18 Civ. 6148 (PED)

CITY OF MIDDLETOWN, *et al.*,

                         Defendants.
------------------------------------------------------------------X
**PAUL E. DAVISON, U.S.M.J.**:

      Plaintiff Jennifer Brennan commenced this action against the City of Middletown and

Middletown Police Officer (now Sergeant) Patrick Cunningham, alleging: (1) Sgt. Cunningham

deprived her of her federal constitutional right to be free from the use of excessive force; (2) Sgt.

Cunningham is liable for battery under New York State law; and (3) the City of Middletown is

vicariously liable under New York state law for Sgt. Cunningham's civil battery.[1]  This case is

before me for all purposes on the consent of the parties, pursuant to 28 U.S.C. §636(c) (Dkt.

#12).

      Plaintiff's claims were tried before a jury on November 12-13, 2019.  On November 13,

the jury returned a verdict in favor of plaintiff and awarded her $15,000 in damages.  Judgment

was entered on November 20, 2019 (Dkt. #38).  Presently before this Court are (1) defendants'

motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil

Procedure ("FRCP") or, alternatively, for a new trial pursuant to FRCP 59, on the issues of

excessive force and qualified immunity (Dkt. #45) and (2) plaintiff's motion for attorneys' fees

and costs pursuant to 42 U.S.C. § 1988 (Dkt. #40).  For the reasons that follow, defendants'

motion is **DENIED** and plaintiff's motion is **GRANTED IN PART**.

---

[1]  Plaintiff abandoned a *Monell* claim against the City of Middletown.

## I.  TRIAL TESTIMONY

The testimony at trial is summarized below.  Numbers in parentheses refer to pages from the trial transcript (Affirmation of Christopher D. Watkins, Esq. in Opposition to Defendants' Post-Trial Motion, Exh. 1) (Dkt. #49-1).

A.  <u>Sharell Bascombe</u>

At all relevant times, Sharell Bascombe was employed as a youth counselor at A Friend's House in Middletown, New York (3-4).  On May 14, 2017, she arrived at work at approximately 8:00 a.m., entered the staff office and saw Jennifer Brennan leaning on a desk (4, 6).  Ms. Bascombe clocked in and went upstairs to check on the children (6).  As she entered room number 2, she heard Ms. Brennan speaking from downstairs in an elevated voice (6-7).  Ms. Brennan ran up the stairs, yelling and screaming, and came into room number 2 (7, 23).  Ms. Brennan and Ms. Bascombe had a conversation; Ms. Bascombe could see that Ms. Brennan was distressed (7).  Ms. Bascombe was "a little shocked" about the situation and, while speaking with Ms. Brennan, positioned herself near the children (7).  Another staff person, Michael, came up the stairs and motioned for the children to follow him; the children left with Michael (7).

Ms. Brennan, screaming and yelling, swung herself and Ms. Bascombe to the floor (23).  Ms. Brennan told Ms. Bascombe about traumatic incidents she had experienced throughout her life (7-8). Ms. Brennan's demeanor was not threatening but "she wasn't herself" (9).  Ms. Bascombe tried "to deescalate and to redirect [Ms. Brennan's] thinking" and they prayed together (9).  Ms. Bascombe tried to move the conversation outside of the house, but Ms. Brennan continued to talk about "deep dark secrets" and things that had transpired in her life (10).  Ms. Bascombe went downstairs ("for something") and saw the police and Mobile Life there (24).  She said something to Michael and went back upstairs (24).

At some point, defendant police officer Patrick Cunningham, along with another male police officer, appeared in the hallway outside of the room (10-11).  Ms. Bascombe and Ms. Brennan came out into the hallway; Ms. Brennan and the officers talked for a while (11-12, 25).  She was attracted to one of the officers (she "found him handsome") and "she would move into his space" but "[n]ot in an aggressive way" (25-26).  Ms. Brennan said she wanted to speak with Valerie, the director of A Friend's House, who was not at the scene (12).  Ms. Brennan and Ms. Bascombe, still upstairs in the hallway with the police officers, spoke to Valerie on speaker phone (15).  Ms. Bascombe understood that Valerie was coming to A Friend's House; Ms. Brennan said she would leave when Valerie arrived (15-16).  The officers wanted Ms. Brennan to leave the building immediately (15-16, 27).  Officer Cunningham kept saying "enough is enough already, now we need you to leave the building" (16); Ms. Brennan kept saying she was not going to leave until the director got there (16).

Officer Cunningham asked Ms. Brennan once more to walk with the officers and leave the building; Ms. Brennan said "nope, I'm not going anywhere" (16).  The officers told Ms. Brennan she was under arrest; one of the one officer approached her and tried to grab her arm (27).  Ms. Brennan was moving around and would not give her arm (28).  Officer Cunningham "charged" plaintiff and pushed her; they bumped in a long hallway table (18).  Both officers struggled with Ms. Brennan and threw her to the floor, face down (18, 22).  Ms. Brennan "was screaming what are you doing or something like why are you doing this to me" (28).  They handcuffed her right arm but could not get her left arm because she kept it under her stomach (19).  The officers struggled with Ms. Brennan (32);  Officer Cunningham told Ms. Brennan more than once to stop resisting (28).  Officer Cunningham told Ms. Brennan he was going to tase her if she did not give up her arm (30).  "[P]retty much right after that," Officer

Cunningham tased Ms. Brennan in her back (19-20, 31).  Ms. Brennan was still face down; her body shook (20-21).  Officer Cunningham was on top of Ms. Brennan with his knee in her back; the other officer was facing her head (22).  Ms. Brennan was tased a second time (33).  Ms. Bascombe was shocked; she told the officers "this is not warranted" and walked forward and said "what did you do that for . . . why did you guys do that" (21, 33).  Officer Cunningham pointed the taser at Ms. Bascombe and said "back the fuck up or I'll fucking tase you, too" (21).  The female Mobile Life responder guided Ms. Bascombe away from the officers (33).

At no point in time after the police arrived had Ms. Brennan been violent, or threatened violence, toward anyone (22).  After the second tase, the officers handcuffed Ms. Brennan, took her outside and placed her in the police car (33-34).  Valerie arrived at the scene after the police took Ms. Brennan away (15).

B.  Plaintiff Jennifer Brennan

Ms. Brennan, forty-seven, lives with her three teenage children (35-36).  For the last two years, she has worked with disabled adults at Access Supports for Living in Middletown, New York (36).  In May 2017, she was employed at A Friend's House in Middletown (36-37).  She does not have a history of mental illness or disability, but she had been abused by her stepmother (38-39).

On Saturday May 13, 2017, Ms. Brennan worked from 8:00 a.m. to 4:00 p.m.; she went home and returned at midnight (on Mother's Day Sunday, May 14) to cover the midnight to 8:00 a.m. shift for a co-worker (36-37).  Ms. Brennan had plans that morning to go to breakfast with her children and was supposed to be able to leave at 8:00 a.m., but Sharell was late (37).  Sharell came in at approximately 8:15 a.m. and said she was having car trouble, she might have to leave and she would have to talk to Valerie (38).  Ms. Brennan became upset because she thought she

"would be stuck" if Sharell left (39).  Sharell went upstairs; Ms. Brennan ran up the stairs after her, yelling at Sharell and asking whether she was going to leave or not (39).  Some children were asleep in one of the upstairs bedrooms; Sharell was in the room with them (39-40).  Ms. Brennan entered the room, still upset, crying and speaking in a loud voice (40).  Her screaming woke the children, and they left the room "within a couple of seconds" (40, 47).  Ms. Brennan spoke with Sharell for some period of time, during which Ms. Brennan talked about being a victim of abuse; Sharell was trying to calm Ms. Brennan down (41).

At some point in time, two police officers (one of whom was Officer Cunningham) and two EMTs from Mobile Life arrived (41).  Ms. Brennan and Sharell went into the hallway; Ms. Brennan told the officers she was upset because she had been a victim of abuse (42-43).  Officer Cunningham, from the beginning, was very rude and unsympathetic to Ms. Brennan (47).  Around that time, she also spoke to Valerie on the phone (42-43).  The EMTs asked Ms. Brennan whether she wanted to go to the hospital, and she said "no" (41-42).  Officer Cunningham told Ms. Brennan she had to leave the house; she said she wanted to wait for Valerie (43, 49).  This exchange continued for a minute or two, then Officer Cunningham forcibly grabbed Ms. Brennan around her arms and shoved her face first to the floor (44).  She banged her head; Officer Cunningham's knee was in Ms. Brennan's back (44).  He got both of her arms and put them behind her back, and then Ms. Brennan felt the taser go into her back (44).  Ms. Brennan did not remember Officer Cunningham saying she was resisting (or anything like that) (44).  Ms. Brennan never hit, kicked or struck either officer at any time (nor had she threatened to do so) (45).

When the taser went off, Ms. Brennan "felt like [she] was going to die"; she "was totally numb" and "just saw black" (44-45).  She wet her pants; Officer Cunningham said "how

-5-

disgusting, I hate when this happens" (45-46).  Ms. Brennan was handcuffed, and Officer

Cunningham grabbed her wrists, pulled her up and led her down the stairs and outside (45-46).

Officer Dudzinski drove her to the hospital (46).

C.  Defendant Patrick Cunningham

Patrick Cunningham has worked as a police officer since 2003 and, since 2005, has been

employed by the City of Middletown Police Department (55).  He was promoted to Sergeant in

June 2019 (55).

On the morning of Sunday, May 14, 2017, Sgt. Cunningham and Officer Dudzinski

responded to a 911 call relayed from A Friend's House (56).  Sgt. Cunningham took the lead at

the scene (56-57).  Upon arrival, the officers immediately went to the staff office and

encountered Sharell, who was on the phone (81-82).  Sgt. Cunningham asked her where the

woman was who was having an anxiety attack; Sharell did not answer (82).  He repeated the

question and then asked where the children were; Sharell did not answer (82).  Sgt. Cunningham

"raised [his] voice in an authoritative manner" and repeated both questions; Sharell responded

that the children were locked in a room on the first floor, and the woman was on the second floor

(82).  Sharell hung up the phone and followed the officers upstairs (83).

The officers encountered Jennifer Brennan in one of the upstairs bedrooms (58, 83).

There were no children in the room; the children were on the first floor (60).  Ms. Brennan

yelled at the officers; she asked "who the fuck were we and what did we want" (83).  Ms.

Brennan was upset; Sgt. Cunningham observed that "was in a manic state" (58, 84).  During the

course of expressing her distress, Ms. Brennan talked about being a victim of child abuse (58).

Sgt. Cunningham engaged her in small talk, to create a rapport and de-escalate the situation (84).

Ms. Brennan came face to face with Sgt. Cunningham "in an aggressive manner" and asked

whether he was married; she "was coming on" to him (84).  Sgt. Cunningham just stood there and kept engaging Ms. Brennan in small talk (84).  Sharell was also talking to Jennifer (85).  Ms. Brennan "was on an emotional roller coaster" and went from "very high, excitable" to "very low, almost in a depressed state" (85).  Two Mobile Life EMTs entered the bedroom and spoke to Ms. Brennan for about ten minutes (60-61, 85).  The EMTs offered to take her to the hospital for a mental health evaluation and she declined (61, 85).  Everyone (Jennifer, Sharell, the two officers and the two paramedics/EMTs) left the bedroom and went into the hallway (86).  The EMTs left (61).

The officers wanted Ms. Brennan to leave the house and Sgt. Cunningham offered her options: he would drive her to the hospital; he would drive her to her home in Blooming Grove; he said her family members could pick her up; he offered to send an officer to pick up her family members and bring them to her; and he offered to drive her anywhere in Middletown (35, 62, 86).  Ms. Brennan refused all of those options (86).  At some point, Ms. Brennan spoke on the phone with the director of the house (59).  Sgt. Cunningham did not recall whether or not Ms. Brennan said she would leave when Valerie got there (61-62).  After thirty or forty minutes of trying to calm Ms. Brennan down and convince her to leave the building, Sgt. Cunningham decided she had to go to the hospital involuntarily because she was a danger to the children and staff members (62, 86-87).

In the hallway, Sgt. Cunningham advised Ms. Brennan she was under arrest pursuant to Mental Hygiene Law section 941, and grabbed hold of her (62).  Sgt. Cunningham understood that, in order for a police officer to take someone into custody under that provision, that person must either threaten or attempt suicide or serious bodily harm or otherwise conduct herself in a manner which is likely to result in serious harm to herself or others (63, 65).  Up to that point,

-7-

Ms. Brennan had not committed any crime, had not threatened suicide, had not caused herself

any bodily harm and had not been violent (or threatened violence) toward anyone else (62-63,

66).

When Sgt. Cunningham grabbed Ms. Brennan, she put her hands in her pockets and was

"flailing around back and forth, screaming at the top of her lungs no, no, no" (67, 88). Within a

matter of seconds, Sgt. Cunningham moved Ms. Brennan toward a table (to get better leverage)

and then forced her, face first, to the floor (67, 89). While she was lying on her stomach, she had

her arms underneath her and her hands in her pockets, "stiff as a board, flailing around, moving

back and forth, almost like a fish out of water"; Sgt. Cunningham knelt on the floor and applied

pressure to her left leg with his right knee (68-69, 89). He was trying to handcuff Ms. Brennan

behind her back, but she would not give him her hands (69). He told her numerous times ("in a

very loud, authoritative voice") to stop resisting (91). Sgt. Cunningham tased Ms. Brennan in

her back (69). Sgt. Cunningham did not warn Ms. Brennan that she was about to be tased; it was

not mandatory to do so (70, 94). Just "a matter of seconds" elapsed between the time Ms.

Brennan was grabbed, placed against the table, taken to the floor and tased (69-70, 90, 95).

During the course of the tasing, Ms. Brennan wet herself (78).

A taser transmits 50,000 volts of electricity and causes neuromuscular incapacitation

(73). One cycle lasts for five seconds (77). A taser is a "very serious tool" (74-75). Sgt.

Cunningham is trained in using pressure points and physical holds to subdue a person (75). At

the time of the incident in question, the City of Middletown Police Department's policy stated

that a taser is not to be used as a substitute for other nonlethal force options; it may be used

"[w]hen deemed a reasonable alternative to lesser force options that will likely be ineffective or

greater force options that may be inappropriate given objective circumstances" (72, 76, 81). The

policy also stated that tasers are designed to restrain violent individuals (76).  Sgt. Cunningham determined Ms. Brennan was "violent" because she "shoved her hands in her pocket and was moving around, not allowing us to put handcuffs on her to arrest her" (79).

Sgt. Cunningham tased Ms. Brennan while she was laying face down on the floor (77). He then reloaded the taser with another cartridge, pointed it at Sharell (who "physically aggress[ed] towards Officer Dudzinski's back" and grabbed the back of his shirt) and "told her, directed her, threatened her" that he would tase her next (77-78, 92-93).  Department policy states that tasers should never be used as a means of coercion (78).

The officers picked Ms. Brennan up and walked her down the stairs (93).  She was not struggling at that point, but she was yelling and creaming at the officers (93).  They walked outside; Ms. Brennan continued to yell at the officers (93-94).  The officers put her in a police car and drove her to Orange Regional Medical Center for a mental health evaluation (94).

Sgt. Cunningham prepared an Incident Report (defendant's Exhibit D) documenting his use of force during his encounter with Ms. Brennan (96-97).  Sgt. Cunningham acknowledged that the report does not mention anything about Ms. Brennan "flailing" (97).  He also acknowledged that the report indicates that he used the taser because Ms. Brennan refused to take her hands out of her pockets (97).

D.  Officer Pavel Dudzinski

At all relevant times, Officer Dudzinski was employed by the City of Middletown Police Department (113).  At the time of the incident (May 14, 2017), he had been on the force for a little over a year (113-14).

On the morning in question, he and Sgt. Cunningham responded to a call at A Friend's House (114).  Upon arrival, downstairs, the officers spoke to a staff person named Sharell; she

and the officers went upstairs to speak with Ms. Brennan (113).  She was in one of the upstairs

rooms; Officer Dudzinski knew the children were "secured in another location" (114-15).  Ms.

Brennan said she was upset initially because she was supposed to be somewhere and Sharell had

been late to work (116).  Ms. Brennan also talked about being a victim of child abuse (116).

Sgt. Cunningham and Officer Dudzinski spoke to Ms. Brennan in an attempt to deescalate the

situation (115, 127).  After a period of time, paramedics arrived and spoke to Ms. Brennan for a

few minutes (116-17).  In sum and substance, the paramedics asked Ms. Brennan whether she

wanted to go to the hospital and she said no (117-18).

In the hallway, Ms. Brennan and Ms. Bascombe spoke on the telephone with someone

(118).  Subsequently, Sgt. Cunningham told Ms. Brennan she needed to go the hospital; she said

she did not want to go (119).  Sgt. Cunningham told Ms. Brennan she was under arrest and

directed her to put her hands behind her back; she "yelled and screamed" and placed her hands in

her pants pockets, tensed her arms, moved away from the officers and said she did not want to go

to the hospital (128-29).  Each officer attempted to grab an arm, but Ms. Brennan continued to

tense her body and yell and scream (129).  The officers unsuccessfully attempted to use a nearby

table to gain some leverage, and continued to tell her to take her hands out of her pockets (129-

30).  The officers picked Ms. Brennan off the table and put her on her stomach, face down on the

floor; she continued to tense her body and would not put her hands behind her back (119-20,

130).  Sgt. Cunningham knelt down with his knee on Ms. Brennan's leg and then tased her in the

back (120).  He did not warn Ms. Brennan that he was about to tase her (120).  It was a matter of

a few seconds between the time Sgt. Cunningham initially grabbed Ms. Brennan and the time he

tased her (120).  After Sgt. Cunningham tased Ms. Brennan, he reloaded a new cartridge and

pointed the taser at Ms. Bascombe (120).  Officer Dudzinski had heard someone taking steps

toward his back, but did not see Ms. Bascombe or feel her touch or grab him (120-21).

Prior to Sgt. Cunningham deploying the taser, Ms. Brennan had not been violent toward anyone (125, 127).  The officers had batons and pepper spray, but opted to use the taser in order to minimize potential injury to themselves and Ms Brennan (132-33).  However, the officers had not used all lesser means of force (pressure points and holds) prior to tasing Ms. Brennan (133-34).  After she was tased, she "immediately let go of her grip of her hands in her pockets" and Officer Dudzinski placed her hands behind her back and handcuffed her (131).

E.  Kevin Pfleging

Kevin Pfleging worked for the last five years as an EMT with Mobile Life (136).  On May 14, 2017, he and his partner (Samantha Crosbie) were dispatched to a psychiatric emergency at A Friend's House (136-38).  They entered the house and were greeted by a police officer (138).  After a few minutes, Mr. Pfleging and his partner went upstairs and saw Ms. Brennan in a room with two or three police officers (139, 141-42).  Ms. Brennan seemed "very upset, very erratic" and did not appear to be in a good state of mind (140).  She was engaged in "normal conversation" with one of the officers (146).

Mr. Pfleging spoke to Ms. Brennan for approximately thirty minutes, trying to convince her to go the hospital; she declined (140-42).  The police officers told her she needed to leave the building, but she refused; they asked her two or three times to go downstairs, but she would not go (142).  The officers held onto Ms. Brennan's arm, trying to bring her downstairs, but she refused (142-43).  She became louder and more upset; she was flailing and pulling away from the officers (143).  The officers took Ms. Brennan to the floor and, after "maybe thirty seconds," she was tased (143).  Once she was tased, the situation deescalated; she was handcuffed and brought downstairs (143).

F.  Samantha Crosbie

On May 14, 2017, Samantha Crosbie was employed by Mobile Life as a paramedic (148).  That morning, she and her partner (Kevin Pfleging) were dispatched to an "unknown medical" at a building on Seward Avenue in Middletown (148-49).  They entered the building and were met by a staff member, who explained why she called and what was going on upstairs (149).  Ms. Crosbie and Mr. Pfleging went upstairs and were let into a room; two police officers were in the room with the patient, who was standing against the wall (149).  She appeared anxious, agitated, wide-eyed and "maybe scared" (150).  Ms. Crosbie and her partner spoke to the patient about what was going on, why 911 was called; they asked how she was feeling and whether she needed an ambulance (150).  After about thirty minutes of conversation, "it was determined that she did not want to go to the hospital" or leave the premises (150).  The staff member was adamant that the patient had to at least leave the building (151).  The police officers told her she would need to leave; she refused (151).  They gave her the option of going to the hospital or, if she did not want to leave, she would be escorted out (151).  Throughout the entire interaction, the patient became more agitated and upset (151).

At some point, the officers started walking towards the patient; she backed herself as far as she could against the wall (152).  The officers reached for her, and she became very agitated and raised her voice (152).  She looked "very scared and very frightened like she might strike out" (152).  As the officers attempted to handcuff her, she was thrashing her body and screaming and yelling (152).  She was put on the ground and the officers attempted to handcuff her behind her back; she "was continuing to fight and scream and yell and thrash and she wasn't cooperating" (152).  The officers told her to stop resisting (152).  One of the officers tased her (153).  At one point, a staff member tried to reach for one of the officers; Ms. Crosbie and her

partner took the staff member back and she left the room (153).  After the patient was tased, the

officers handcuffed her behind her back, stood her up and walked her out of the building (153).

## II.  JURY INSTRUCTIONS: EXCESSIVE FORCE

Defendants do not raise any objections to the jury charge.  The jury was instructed

regarding plaintiff's excessive force claim, in relevant part, as follows:

> The Fourth Amendment to the United States Constitution protects persons from being subjected to excessive force while being placed into custody.  In other words, regardless of whether the seizure itself is proper, a law enforcement officer may employ only the amount of force reasonably necessary under the circumstances to place someone into custody.
>
> To determine whether the acts of defendant Officer Cunningham caused plaintiff to suffer the loss of her right to be free from the use of excessive force, you must determine whether the amount of force used by defendant was that which a reasonable officer would have employed to effectuate placing plaintiff into custody under similar circumstances.  In making this determination, you may take into account such factors as the circumstances surrounding the decision to place plaintiff in custody, whether plaintiff posed an immediate threat to the safety of defendant Cunningham or others, and whether plaintiff actively resisted being placed into custody or attempted to evade being placed into custody by flight.  In determining whether the defendant used excessive force, you may also consider whether less aggressive techniques were available to the officer, as well as whether the officer adequately warned the individual and gave her an opportunity to comply before using a more aggressive type of force, such as a Taser.  However, a warning is not necessary under all circumstances, and you must consider the totality of all the circumstances in determining whether the defendant's conduct was objectively reasonable.
>
> The mere fact that force was used during the course of placing someone into custody is not sufficient, by itself, to demonstrate that a defendant violated a plaintiff's constitutional rights.  Not every push or shove by a police officer violates a person's constitutional rights, even if it may later seem unnecessary in the peace and quiet of this courtroom.  Minor scrapes, bumps, or bruises potentially could occur, often unintended, during the act of placing someone into custody.  The police are not required to utilize the least amount of force possible to place someone into custody.  The Constitution requires that the force used be objectively reasonable.  In that regard, you may consider whether the defendant officer violated some municipal policy or procedure in determining the reasonableness of the officer's conduct.  However, the violation of a municipal policy – by itself – does not necessarily establish a Constitutional violation.
>
> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision

of hindsight.  In some situations, police officers are forced to make split-second judgments about the amount of force that is necessary in a particular situation, under circumstances that are tense, uncertain and rapidly evolving.  In determining whether an officer's use of force was objectively reasonable under the circumstances, you should not consider the officer's underlying intent or motivation.  A police officer's good intentions will not make an excessive use of force permissible, and his bad intentions will not make a reasonable use of force excessive.  The question is whether the officer's actions were objectively reasonable in light of all the facts and circumstances confronting him at the time of the arrest, without regard to his underlying intent or motivation.

Dkt. #49-3.

## III.  LEGAL STANDARDS GOVERNING DEFENDANTS' MOTIONS

A.  FRCP 50(b) Motion for Judgment as a Matter of Law

"Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [the non-movant's] favor."  Stevens v. Rite Aid Corp., 851 F.3d 224, 228 (2d Cir. 2017) (quotation and citation omitted).  "A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict."  Toliver v. N.Y.C. Dep't of Corr., 202 F. Supp.3d 328, 333-34 (S.D.N.Y. 2016) (quoting Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir.2005)).  Under those circumstances,

the district court may set aside the verdict only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against him.

Id. (quoting Cross, 417 F.3d at 248).  In making this determination, the court "should review all of the evidence in the record" and "is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all

-14-

reasonable inferences that the jury might have drawn in [its] favor from the evidence." Tolbert v. Queens Coll., 242 F.3d 58, 70 (2d Cir. 2001)  (quotation marks and citations omitted).  "The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury," and "must disregard all evidence favorable to the moving party that the jury is not required to believe." Id. (citations omitted).

"Under Rule 50(a), a motion for judgment as a matter of law must first be made before the case is submitted to the jury, and renewed following the verdict pursuant to Rule 50(b)." ING Global v. United Parcel Serv. Oasis Supply Corp., 757 F.3d 92, 97 (2014).  To this end:

> The law is pellucid that a party's failure to move under Rule 50(a) has consequences.  If that party later moves under Rule 50(b), the standard for granting judgment as a matter of law is elevated, and the motion may not properly be granted by the district court, or upheld on appeal, except to prevent manifest injustice.  Manifest injustice exists where a jury's verdict is wholly without legal support.

Id. (internal citation omitted).

B.  FRCP 59(a) Motion for a New Trial

Defendants move in the alternative for a new trial pursuant to FRCP 59(a) on the ground that the verdict was against the weight of the evidence.  Second Circuit "precedent is clear that a decision is against the weight of the evidence if and only if the verdict is (1) seriously erroneous or (2) a miscarriage of justice." ING Global, 757 F.3d at 99 (quoting Raedle v. Credit Agricole Indosuez, 670 F.3d 411, at 417-18 (2d Cir. 2012)).  A court faced with a Rule 59(a) motion for a new trial on the ground that the verdict was against the weight of the evidence "need not view the evidence in the light most favorable to the nonmoving party; instead, the court may weigh the evidence–including the credibility of witnesses–independently." Starr Indem. & Liab. Co. v. Am. Claims Mgmt., Inc., 131 F. Supp.3d 185, 188 (S.D.N.Y. 2015) (citing Manley v. AmBase

Corp., 337 F.3d 237, 244-45 (2d Cir.2003)).  However, Second Circuit "cases teach that a high degree of deference is accorded to the jury's evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency."  ING Global, 757 F.3d at 99.  Thus, in cases like the one at bar, where "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice."  Id. (quoting Raedle, 670 F.3d at 418-19).  In sum, "[t]he task before the court is to balance respect for the jury's findings . . . with avoidance of miscarriage of justice and the court may only grant a new trial if, after viewing all the evidence, it has a definite and firm conviction that a mistake has been committed."  Grant v. City of Syracuse, 357 F. Supp.3d 180, 192 (N.D.N.Y. 2019) (quotation marks and citation omitted).

C.  Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Mullenix v. Luna, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (quotation marks and citation omitted).  In other words, "[w]here the right at issue in the circumstances confronting police officers was clearly established but was violated, the officer will still be entitled to qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights."  Outlaw v. City of Hartford, 884 F.3d 351, 367 (2d Cir. 2018).

"[T]he matter of whether a defendant official's conduct was objectively reasonable, i.e., whether a reasonable official [in the defendant's position] would reasonably believe his conduct did not violate a clearly established right, is a mixed question of law and fact."  Id. (quoting

Kerman v. City of New York, 374 F.3d 93, 109 (2d Cir. 2004)).  If there is a "dispute as to the material historical facts, . . . the factual question[s] must be resolved by the factfinder." Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007) (quotation marks and citation omitted).  "Once the [factfinder] has resolved any disputed facts that are material to the qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court." Id.

"Because qualified immunity is an affirmative defense, '[t]o the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question.'" Jones v. Treubig, No. 18-3775, 2020 WL 3476739, at *13 (2d Cir. June 26, 2020) (quoting Zellner, 494 F.3d at 368).  "If the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding." Zellner, 494 F.3d at 368.

## IV.  ANALYSIS OF DEFENDANTS' MOTION

### A.  Rule 50(b): Excessive Force

Defendants assert that they are entitled to judgment as a matter of law pursuant to FRCP 50(b) on the issue of excessive force.  Dkt. #45, at 4-7.  The trial transcript reveals, however, that defendants failed to move under Rule 50(a) for judgment as a matter of law.  See Dkt. #49-1, at 135 (reflecting that defendants called their first witness immediately after plaintiff rested); Dkt. #52-2, at 2-7 (reflecting that *plaintiff* moved under Rule 50(a) for a directed verdict at the close of the testimony).  Thus, defendants are entitled to judgment as a matter of law under Rule 50(b) only if the court determines it would constitute manifest injustice to uphold the    jury's determination that defendant Cunningham subjected plaintiff to excessive force.

Here, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could have found the following facts:

- plaintiff spoke to Valerie on the phone and understood Valerie was on her way there;

- plaintiff told the officers she would leave when Valerie arrived;

- defendant Cunningham arrested plaintiff on the ground she was a danger to the children and staff members;

- the children and staff members were not in danger;

- plaintiff had not committed a crime or threatened suicide;

- only a few seconds elapsed between the time plaintiff was grabbed, placed against the table, taken to the floor and tased;

- Middletown Police Department policy states that tasers are designed to restrain violent individuals;

- plaintiff had not been violent, or threatened violence, toward anyone;

- Middletown Police Department policy states that a taser is not be used as a substitute for other nonlethal force options (e.g. pressure points and physical holds);

- defendant Cunningham was trained in the use of pressure point and physical holds to subdue a person;

- the officers did not use pressure points or holds to subdue plaintiff prior to tasing her;

- Valerie arrived at the house after the officers took plaintiff away.

\* \* \*

Further, a jury applying the law (as instructed) to these facts could reasonably conclude that defendant Cunningham subjected plaintiff to excessive force.  Therefore, because defendants' motion fails under the "insufficient evidence" standard (which would have applied if defendants

had moved under Rule 50(a)), it clearly fails under the elevated "manifest injustice" standard. Accordingly, defendants are not entitled to judgment as a matter law on plaintiff's excessive force claim.

B.  Rule 59(a): Excessive Force

Defendants alternatively seek a new trial pursuant to FRCP 59(a) on the ground that the jury's excessive force determination was against the weight of the evidence.  Dkt. #45, at 4-7.  I disagree.  As discussed above, the evidence was sufficient for a reasonable jury to find defendant Cunningham liable for excessive force.  Further, mindful of the high degree of deference owed to the jury's credibility determinations, the jury's verdict was not seriously erroneous or a miscarriage of justice.  Accordingly, defendants are not entitled to a new trial on plaintiff's excessive force claim.

C.  Qualified Immunity

Defendants argue that defendant Cunningham is entitled to judgment as a matter of law pursuant to Rule 50(b) based on qualified immunity.  Dkt. #47, at 7-11.  As an initial matter, defendants have waived this argument because they did not raise qualified immunity on a Rule 50(a) for judgment as a matter of law.  See Toliver v. N.Y.C. Dep't of Corr., 202 F. Supp.3d 328, 337 (S.D.N.Y. 2016).  Nonetheless, "some courts excuse such failure when the parties and the Court agree to present special interrogatories on issues relevant to qualified immunity to the jury."  Id.  Here, however, defendants declined to do so.  According to defendants:

> At the pretrial conference on October 23, 2019, . . . the Court indicated on the record *that it was not inclined to give qualified immunity interrogatories to the jury*.  The Court also stated that it would make the qualified immunity determination, which, of course, would not be necessary if the jury returned a verdict of no liability for excessive force.  I agreed and did not ask for any specific interrogatories.

Dkt. #50, ¶ 6 (emphasis added).  However, the transcript of the pretrial conference belies

defendants' assertion that the Court "was not inclined" to allow special interrogatories:

> [THE COURT]: The only other thing in our preliminary review of the pretrial submissions, Mr. Smith – and this is really for you to ponder – we do not submit the qualified immunity defense to the jury.[2]  That's a question of law to be determined by the Court.  If there are – if there is a set of facts that you think you could prove that would qualify the officers – would trigger – I say officers; there's really one officer here – would trigger the qualified immunity defense, *you're free to propose factual interrogatories to the jury if that's what you want to do*.
>
> I will say I have a little trouble in this context of this case imagining a set of facts in which the jury would find that the officer used excessive force against this plaintiff, but was nonetheless entitled to qualified immunity, *but I leave that to counsel to ponder*.
>
> In any event, we're not going to submit the question to the jury in the manner proposed by defendants' proposed charge.
>
> MR. SMITH: Yes, Judge.
>
> THE COURT: *You can ponder that*.
>
> MR. SMITH: I wasn't sure how it worked, so I put it in there just to be careful.
>
> THE COURT: Okay.  Got it.
>
> MR. SMITH: I mentioned it in the interrogatory.  I thought about it.  And I agree.  *I couldn't think of anything specific myself*.

Dkt. #52-1, at 8-9 (emphasis added).  Thus, defendants were clearly afforded the opportunity to

submit special interrogatories (relevant to the issue of qualified immunity) to the jury but chose

not to.  "Thus, [d]efendants' failure to move under Rule 50(a) for judgment as a matter of law on

the issue of qualified immunity . . . is not excused."  Toliver, 202 F. Supp.3d at 337.

---

[2]  Defendants' requests to charge included a proposed instruction on qualified immunity. Dkt. #50-1, at 4-6.  In conjunction with the proposed charge, defendants suggested "this Court may want to pose questions directed at the specifics of the jury's determination of whether [p]laintiff was engaged in active resistance."  Id. at 4, n.1.

However, at least one district court has held it was not precluded from overlooking defendants' failure to submit special interrogatories on the issue of qualified immunity and ruling on defendant's Rule 50(b) motion, "as long as the ruling is based on the *plaintiff's* version of the facts elicited at trial." Lee v. McCue, No. 04 Civ. 6077, 2007 WL 2230100, at *3 (S.D.N.Y. July 25, 2007) (emphasis in original).  Here, based upon plaintiff's version of the facts elicited at trial, defendant Cunningham is not entitled to qualified immunity.

At the time of plaintiff's encounter with defendant Cunningham, "it was clearly established that an officer's significant use of force against an arrestee who was no longer resisting and who posed no threat to the safety of officers or others – whether such force was by pepper spray, taser, or any other similar use of significant force – violates the Fourth Amendment." Jones, 2020 WL 3476739, at *7.  Thus, defendant Cunningham's entitlement to qualified immunity turns on whether "it was objectively reasonable for him to believe that his acts did not violate those rights." Outlaw, 884 F.3d at 367.  Defendant Cunningham contends he is entitled to qualified immunity because "there can be no serious doubt that [Ms.] Brennan was still actively resisting when she was tased[.]" Dkt. #47, at 10.  Plaintiff disputes this contention, and asserts that "a reasonable jury could conclude that [p]laintiff posed no threat of harm and was not resisting at all (let alone actively) at the time [Sgt.] Cunningham tased her[.]" Dkt. #48, at 14.

Here, plaintiff testified:

- Officer Cunningham told her she had to leave the house, and she told him she wanted to wait for Valerie;

- this exchange continued for a minute or two, then Officer Cunningham forcibly grabbed her around her arms and shoved her face first to the floor;

- she banged her head;

- Officer Cunningham's knee was in her back;

- Officer Cunningham got both of her arms and put them behind her back, and then Ms. Brennan felt the taser go into her back;

- she did not remember Officer Cunningham saying she was resisting (or anything like that);

- she never hit, kicked or struck either officer at any time (nor had she threatened to do so).

* * *

Thus, based upon plaintiff's version of the facts, she was not actively resisting when she was tased.  Accordingly, defendant Cunningham is not entitled to judgment as a matter of law on the ground of qualified immunity.[3]

## V.  PLAINTIFF'S MOTION FOR ATTORNEYS' FEES

In a § 1983 case, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b).  The Supreme Court has stated that the prevailing party should recover attorneys' fees "unless special circumstances would render such an award unjust."  Hensley v. Eckerhart, 461 U. S. 424, 429 (1983) (citations omitted).  "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."  Id. at 437.  A

---

[3]  Defendants also move for a new trial on the issue of qualified immunity.  However, given defendants' assertion that the facts underlying their qualified immunity defense are not in dispute, the issue is solely a question of law.  Accordingly, defendants' Rule 59(a) motion for a new trial on the ground of qualified immunity is denied.

reasonable fee is calculated by taking "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  Id. at 433.  "Both [the Second Circuit] and the Supreme Court have held that the lodestar – the product of a reasonable hourly rate and the reasonable number of hours required by the case – creates a 'presumptively reasonable fee.'" Millea v. Metro-North R.R. Co., 658 F.3d 154, 166 (2d Cir.2011) (citing Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182, 183 (2d Cir.2008); Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 130 S. Ct. 1662, 1673, 176 L. Ed.2d 494 (2010)). Ultimately, "[t]he district court retains discretion to determine . . . what constitutes a reasonable fee."  Id.

Here, plaintiff seeks an award of attorneys' fees in the amount of $72,645.00.  In support of her motion, plaintiff submits affidavits from Christopher D. Watkins (Dkt. #42) and Stephen Bergstein (Dkt. #43) which set forth their extensive experience with civil rights litigation and the basis for their requested hourly rates, and incorporate contemporaneous time records demonstrating the hours spent on this litigation.  Based upon those affidavits, the following is a summary of the "lodestar" amount requested:

|  | Compensable Hours | Hourly Rate | Total |
|---|---|---|---|
| Watkins | 118.7 | $475.00 | $ 56,382.50 |
|  | 23.0 (travel) | $237.50 | $  5,462.50 |
| Bergstein | 18.3 | $450.00 | $  8,235.00 |
|  | 11.0 (travel) | $225.00 | $  2,475.00 |
| Paralegal Bell | 0.9 | $100.00 | $     90.00 |

**Total Fees**                                                    **$ 72,645.00**

* * *

Additionally, plaintiff submits receipts in support of her request for an award of costs in the

amount of $1,304.55.  Dkt. #42-2.  Thus, plaintiff seeks an award of attorneys' fees and costs in

the total amount of $73,949.55.

Defense counsel submitted a declaration in response to plaintiff's motion, in which he

avers that he has "no quarrel with [p]laintiff's counsels' experience, rates, hours, and

calculations."  Dkt. #44.  Defendants' consent to plaintiff's application notwithstanding, the

Court has an independent obligation to ensure fairness in the exercise of its discretion in

determining a reasonable fee award.  After reviewing plaintiff's motion and supporting

affidavits, I conclude that plaintiff's fee request is reasonable, with one caveat.

As demonstrated in their affidavits, Mr. Watkins and Mr. Bergstein are both experienced

civil rights litigators.  Mr. Watkins "primarily litigated this case on [his] own" but was "assisted"

by Mr. Bergstein "during the last phase of trial preparation and at trial itself."  Dkt. #42, at 7.[4]

Mr. Watkins asks this Court to set his hourly rate at $475.00; Mr. Bergstein requests an hourly

rate of $450.00.  While the Court can appreciate that two heads are better than one in the heat of

trial, an attorney of Mr. Watkins' caliber is clearly capable of trying a straightforward excessive

force case on his own.  Notably, Mr. Bergstein did not examine witnesses, present arguments to

the jury or participate in legal arguments to any significant extent.[5]  After careful consideration,

---

[4]  Mr. Bergstein also participated in an initial intake interview with Ms. Brennan, and in
certain pre-suit formalities.

[5] Mr. Bergstein first filed a Notice of Appearance in this matter on November 22, 2019,
after the trial had been completed and judgment entered. Dkt. 39.

this Court cannot, in good conscience, award a second, similarly-experienced attorney partner-level compensation for second-chair trial support during this relatively simple trial.

To be clear, Mr. Bergstein is an accomplished civil rights attorney, and the Court in no way questions his professional qualifications, his experience, or his suitability to command partner-level compensation in an appropriate case.[6] Nor does the Court question the practice of staffing complex cases with multiple attorneys. In the circumstances of this case, however, and in light of the Court's experience with other, similar cases, the Court feels obliged to apply some parsimony in its fee award. See DiFilippo v. Morizio, 759 F.2d 231, 236 (2d Cir. 1985) ("reasonableness . . . informed by the district court's familiarity with the particular case and its experience in such matters").

Accordingly, the Court will reduce Mr. Bergstein's hourly rate to $250.00, in line with the going rate for an experienced associate. See Ekukpe v. Santiago, No. 16 Civ. 5412, 2020 WL 1529259, at *5 (S.D.N.Y. Mar. 31, 2020) ($250.00 hourly rate for experienced associate); Cocuzza v. Rockland County, N.Y., No. 17 Civ. 8217, 2019 WL 6498915, at *4 (S.D.N.Y. Nov. 7, 2019) ("Precedent in the Southern District of New York demonstrates that a reasonable hourly rate for a civil rights attorney can range from $250 to $650."), report and recommendation adopted, 2019 WL 6498092 (S.D.N.Y. Dec. 2, 2019).

Therefore, incorporating Mr. Bergstein's adjusted hourly rate, plaintiff is entitled to a fee award in the amount of $67,885.00, calculated as follows:

|  Compensable Hours | Hourly Rate | Total |
| --- | --- | --- |

---

[6] This Court has previously granted Mr. Bergstein (along with a second attorney) partner-level compensation in a more complex and difficult case. See Zeno v. Pine Plains Cent. Sch. Dist., No. 07 Civ. 6508 (PED) (S.D.N.Y. filed Aug. 9, 2010).

| | | | |
|---|---|---|---|
| Watkins | 118.7 | $475.00 | $ 56,382.50 |
| | 23.0 (travel) | $237.50 | $  5,462.50 |
| Bergstein | 18.3 | $250.00 | $  4,575.00 |
| | 11.0 (travel) | $125.00 | $  1,375.00 |
| Paralegal Bell | 0.9 | $100.00 | $      90.00 |
| **Total Fees** | | | **$ 67,885.00** |

\* \* \*

Accordingly, plaintiff is entitled to an award of attorneys' fees and costs in the total amount of $69,189.55.

## VI.  CONCLUSION

For the foregoing reasons: (1) defendants' motion for judgment as a matter of law or, alternatively, for a new trial is **DENIED**; and (2) plaintiff's motion for attorneys' fees and costs is **GRANTED IN PART**, to the extent that plaintiff is awarded $69,189.55.

The Clerk of the Court is directed to terminate the pending motions (Dkt. #40, #45).

Dated: July 8, 2020                          **SO ORDERED**
       White Plains, New York

_____
PAUL E. DAVISON, U.S.M.J.

-26-